THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* LUIS MANUEL MATOS PRETTO, Defendant and Appellant.

Nos. CR-64-420, CR-64-421. Decided February 2, 1966.

112

*Santos P. Amadeo* and *Rafael S. Vidal* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Rodolfo Cruz Contreras, Deputy Solicitor General,* for The People.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

The main issue in these appeals is: Whether the unlawful killing of two or more persons in an automobile accident constitutes a single offense of involuntary manslaughter or as many offenses of involuntary manslaughter, separate and distinct, as there were persons killed on the occasion of the same accident.

About 1 p.m. of June 17, 1962, Balbina Fuentes Rodríguez, an old lady, and her granddaughter, Leila Margarita Rodríguez López, were traveling by foot along the left-hand side of public highway No. 3, section between Yabucoa and Humacao, in the direction of this city. Luis Manuel Matos

Pretto was operating a car, also in the direction towards Humacao, in the company of Santiago Amaro Cintrón. Shortly before overtaking the old lady he swerved to the left and ran over them, causing such serious injuries to both that they died instantly.

On July 11, 1962, the district attorney filed two informations of involuntary manslaughter against the operator, Luis Manuel Matos Pretto, one for the killing of the old lady, Balbina Fuentes Rodríguez, and the other for the killing of her granddaughter, Leila Margarita Rodríguez López. Their text is the same except for the name of the victim. That of the old lady reads in the pertinent part as follows:

"The district attorney hereby files information against Luis Manuel Matos Pretto . . . for the offense of involuntary manslaughter . . . committed as follows: The said defendant . . . unlawfully and while operating a motor vehicle did so without observing due caution and circumspection, driving at a speed greater than that which allowed him to exercise due control of the vehicle and to slacken the speed, or to stop when necessary in order to avoid running over other persons or children, without sounding any alarm or device to pedestrians traveling alongside the road, without taking into consideration the traffic on that road, operating the vehicle negligently and without adopting measures to prevent it, as a result of which he ran over Balbina Fuentes Rodríguez, a human being, thereby causing her unlawful death."

The trial of both cases was held before a jury on September 16 and 17, 1963. The district attorney offered at the trial the testimony of eight witnesses; the defendant testified in self-defense and also offered the testimony of two witnesses, one of whom was in his company the day of the accident. The jury brought in each case a verdict of guilty of involuntary manslaughter. He was sentenced to serve one year in jail in each case, to be served consecutively, and his driver's license was cancelled for one year.

On appeal from the judgments,[1] he alleges: (1) the trial and the judgments are void "since . . . he did not have an impartial trial, in view of the fact that there was a 'variance' between the pleadings in the information and the evidence heard in the prosecution"; (2) the trial court erred in holding that the district attorney could impeach defendant's testimony with a statement given by him to the district attorney, without warning him of his constitutional right not to testify and to have assistance of counsel; (3) it also erred in holding that the district attorney could impeach the testimony of a defense witness with a statement which such witness had given during the preliminary investigation; (4) the prosecution and the judgment are null and void because the stenographer did not take down the district attorney's argument as ordered by the court; (5) the verdict is not supported by the evidence; and (6) the court erred in sentencing the defendant for the death of the two victims notwithstanding it occurred as a result of an act of negligence.

■ 1. In our opinion, there was no variance, discrepancy, or disagreement between the allegations in the information and the evidence heard in the prosecution. According to the informations, the unlawful death of the old lady and of her granddaughter occurred as a result of defendant's act in operating his car in the following unlawful manners: (1) without due caution and circumspection; (2) at a speed greater than that which allowed him to exercise due control over the vehicle and to slacken the speed, or to stop when necessary in order to avoid running over other persons; (3) without sounding any alarm or device to pedestrians traveling alongside the road; (4) without taking into consideration the traffic on the road; (5) operating the vehicle

---

[1] Defendant moved for a new trial based on newly discovered evidence. The petition was denied and he appealed from the order to that effect. Before us he does not raise any question regarding this incident.

recklessly; and (6) without adopting measures to avoid running over them.[2]

 According to § 203 of our Penal Code, involuntary manslaughter is the unlawful killing of a human being, without malice, in the commission of an unlawful act not amounting to felony; or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution or circumspection. This section does not require the concurrence of all those unlawful manners of acting or operating in order that the unlawful killing be produced; it is sufficient that it occur in the commission of only one act of the nature referred to therein. Cf. *People* v. *Serrano*, 85 P.R.R. 658 (1962).

The People proved almost all six manners of unlawful driving with which the district attorney charged defendant in both informations.

The prosecution evidence established positively: that while the old lady and her granddaughter were traveling by foot along the left-hand side of highway No. 3, in the direction of Humacao, "that man, the defendant, was driving a car . . . from Yabucoa to Humacao; then he swerved to the left and hit the old lady, crushed her to pieces"; the car knocked down the girl, crashed into a lamppost and overturned right there (Tr. Ev. 12, 13); the road was wide and no other cars were traveling along there at that moment, (Tr. Ev. 18); it swerved from the right-hand lane toward the left lane, "crossing the road, hitting Balbina Fuentes, killing her, and . . . running over her and also overtaking

---

[2] The Vehicle and Traffic Law of Puerto Rico, No. 141 of 1960 (Sess. Laws, p. 408), declares illegal and punishes as misdemeanors all those forms, modes, or manners of operating a motor vehicle. Sections 5-201 and 5-1002(3) prohibit the forms numbered 1, 5 and 6; § 5-101(a), those numbered 2 and 4; and § 5-1002(3), that numbered 3, and, as already stated, also No. 6.

the young girl, and killing her; it stopped further on," (Tr. Ev. 37); "they had no time to defend themselves nor to do anything . . . he swerved and hit them at a short distance—[Tr. Ev. 39]—he hit both of them from the back," (Tr. Ev. 40); "he didn't hit both at the same time"; "he hit the lady and knocked her down. Then he overtook the other at a short distance, the girl, and hit her," (Tr. Ev. 41); "they were not walking hand in hand . . . the old lady was lagging behind and the girl ahead of her," (Tr. Ev. 42); "the car did not sound the horn, nor apply the brakes, nor do anything"; "the car was in good condition, it did not have any defective tire," (Tr. Ev. 44); "the brakes and the front gear were checked and we did not find any defect." (Tr. Ev. 110.)

The foregoing is part of the uncontradicted testimony of three neighbors of the place who witnessed the accident.

On the other hand, it was proved by evidence also believed by the jury that shortly after the accident an automobile operated by Mario Piñero, in which his wife and a person named Luisa Ferrer were traveling, drew near the place. Then the defendant and his companion, Santiago Amaro Cintrón, fearing for their safety, asked Piñero and his wife to take them to the Humacao police station. They agreed and the defendant, who kept crying on the way to Humacao, of his own accord told them "that he was coming from Maunabo after visiting the grave of his grandfather who had died recently; that they are from Bayamón, he had worked until late at night, was then returning to work and had fallen asleep, and had caused two deaths." (Tr. Ev. 32 and 46.)

■ If defendant committed what the first three witnesses actually saw, with full consciousness of what he was doing at that moment, or if he caused those deaths upon falling asleep, in either case he consciously committed an unlawful

act which caused two unlawful deaths, or did so without due caution or circumspection.[3]

■ Obviously there was no fundamental variance between the pleadings in the informations and the evidence presented. The possible insufficiency of the evidence offered on the unlawful manner of operating did not create a situation of discrepancy. Much less did the evidence establish an offense other than that charged.

The present Rules of Criminal Procedure were in force on the date of the trial. Rule 38(d) provides as follows:

"(d) *Variance between pleadings and the evidence.* The court may allow amendments to be made to the information, complaint or to a bill of particulars at any time before the conviction or acquittal of the defendant, in case there is a variance between these pleadings and the evidence. The variance between the pleadings and the evidence shall not constitute grounds for the acquittal of the defendant; but the court shall, provided the defendant does not oppose it, postpone the trial if the substantial rights of the defendant have been impaired, to

---

[3] In *Rodríguez Rolón* v. *Superior Court*, 91 P.R.R. 816 (1965), we said:

"Although controvertibly, the presumption is that every person intends the ordinary consequences of his own act. It cannot be argued that petitioner's conduct until the very moment he fell asleep was not voluntary. From the moment he started to drive at his own risk, notwithstanding his state of exhaustion, tiredness, mental fatigue, and prolonged lack of sleep, he became a threat or potential danger to the safety and life of other persons using those public thoroughfares. A driver who by his conduct creates a risk for those using said thoroughfares cannot deny that his intention was to cause damage to someone and to his property, although not to anyone in particular.

. . . . . . . .

"He was not charged with and convicted for what he did or could have done while he was asleep, but for his previous negligent conduct in deciding to drive in that condition, for his carelessness and failure to take the precautions required by his condition, and for not preventing what he had foreseen could occur. As correctly stated by the Superior Court: 'If appellant was conscious of physical tiredness and mental fatigue, he should not have assumed the responsibility of driving a motor vehicle. In doing so, he was grossly negligent and should answer for the natural consequence of his reckless act.'"

hold it before another jury or before the same court if the trial is not by jury, and as determined by the court.

"If the discrepancy or variance is of such nature that the evidence establishes an offense different from the one charged against the defendant, and not included therein, or if it establishes an offense beyond the jurisdiction of the court, the jury shall be discharged and the case shall be dismissed."

Defendant did not actually raise at the trial any question of variance. At the close of the prosecution evidence he merely moved for acquittal, alleging that the evidence "did not constitute evidence of negligence." That contention was decided against him.

■ 2 and 3. In the second and third assignments appellant alleges that the trial court erred in holding that the district attorney could impeach the testimony given at the trial by the defendant and his witness, Amaro Cintrón, with the statements given by them before the district attorney in the course of the preliminary investigation. There is no merit to either of these two assignments.

The testimonies which defendant and his witness gave at the trial tended to prove that another car was traveling slowly in front of defendant's car; that defendant tried to overtake it as the old lady and her granddaughter entered the road; that as he tried to swerve to the left for that purpose, the wheel of his car "started to weave to both sides and he could not control it," hitting and running over them.

Upon questioning by the district attorney, both admitted that on the day of the occurrence they had given statements before the district attorney and that they had not said therein that the wheel of defendant's car started to weave at that moment, and that for that reason he lost control of its movements. Defendant denied having stated on that occasion to the district attorney "that he had lost control of the wheel when he heard the screams of the lady, the old lady, at that moment." The district attorney did not offer

any of those statements as evidence in rebuttal, nor for any other purpose. In the light of the circumstances concurring in the cases at bar, the cases of *Escobedo* v. *Illinois*, 387 U.S. 181; *White* v. *Maryland*, 373 U.S. 59; and *People* v. *Anderson*, 40 West's Cal. Rptr. 257, are not in point.[3a]

■ 4. In the fourth assignment of error appellant maintains that "the prosecution and the judgments rendered against defendant are null and void because the stenographer did not take down the district attorney's argument to the jury as the trial judge had ordered." Appellant contends "that he has been deprived of his right to appeal on the basis of everything that happened during the prosecution, and, therefore, that he has been deprived of his liberty without due process of law"; that defendant has the right "to take appeal on the basis of the stenographic record of the prosecution, including the district attorney's argument which forms part of the prosecution, and if request is made to have it taken down, the presumption is that it is necessary for the appeal." He cites the cases of *People* v. *Vélez*, 77 P.R.R. 775 (1954); *People* v. *Fournier*, 80 P.R.R. 376; and *Reyes* v. *Delgado*, 81 P.R.R. 906 (1960).

From an examination of the original records of both cases and of the transcript of the evidence we conclude that the assignment of error is, in addition to frivolous, strange, unusual and surprising.

It is true that at the close of the presentation of the evidence of both parties, and when it was time for the arguments to the jury, one of defendant's attorneys moved the court to order the stenographer to take down verbatim the district attorney's argument, and that the court so ordered. (Tr. Ev. 115.)

However, it is also true that on the same day defendant

---

[3a] *Cf. Walder* v. *United States*, 347 U.S. 62 (1954); *United States* v. *Currie*, 354 F.2d 163 (2d Cir. 1965).

filed his appeals his attorneys subscribed and presented to the trial court the following motion:

"Motion Requesting Transcript of Evidence To the Hon. Court:

"Now comes defendant, by his undersigned counsel, and respectfully alleges and prays:

"1. That defendant has appealed to this Supreme Court from the judgments rendered by this court in above-entitled cases.

"2. That in order to be able to perfect the appeal, it is necessary for defendant to move this court to order the stenographer to transcribe the record of the prosecution, *with the exception of the district attorney's argument and the defense attorney's argument*. [Italics in the original by the attorneys themselves.]

"WHEREFORE, defendant respectfully prays this court to enter an order directing the stenographer to make the transcript, as required by law and the case law."

And it is also true that on February 18, 1964, the trial court, in granting above motion, ordered that the stenographic transcript be prepared, but

". . . with the exception of the district attorney's argument and the defense attorney's argument."

In view of the foregoing, we need not elaborate further in support of the impropriety, frivolousness and strange nature of the assignment in question.

5. The sole enouncement of the only four lines which appellant's brief devotes to the fifth assignment is sufficient not to consider it. It merely says therein: "Defendant-appellant maintains that, notwithstanding the fact that the jury found defendant guilty, the evidence heard in the prosecution is of such a conflicting nature that it is not sufficient to sustain the validity of the verdicts."[4]

---

[4] An assignment of error which is not fundamental, which is stated in the brief without argument or the grounds on which it is based, will not be

■ 6. Question of law raised in the last assignment of error: Whether upon the occurrence of the unlawful deaths of two or more persons as a result of an automobile accident due to the driver's negligence, it is proper to file against the latter only one information of involuntary manslaughter for all the deaths caused, or, on the contrary, whether it is proper to file one information, distinct and separate, for each person killed.

In support of his contention that he should be charged with the death of one of them, appellant alleges: (1) That "the case law has almost uniformly held that when such is the situation, unlike the situation when the death is intentional, a person may be prosecuted for only one death"; (2) that the prosecution of a person for causing two deaths exerts influence in the mind of the jury; and (3) this is prejudicial because the judge may impose penalties to be served consecutively, as he did in these cases.

The first argument, which is not based on any authority, is not correct. We assume that it has only meant to make reference to the American case law, since in ours there is no decision relating to traffic accidents specifically deciding that point.[5] The opinions are not unanimous in the American state decisions which have considered the problem. However, the tendency of the case law to favor the theory of commission of as many offenses as there are victims of

---

considered on appeal. See *De Jesús* v. *Assad*, 63 P.R.R. 131, 134 (1944); *People* v. *Alsina*, 79 P.R.R. 44 (1956); *People* v. *Torres Rosario*, 89 P.R.R. 142 (1963).

[5] In *People* v. *Bastián*, 71 P.R.R. 789 (1950), appellant was charged with and convicted of two violations of § 328 of the Penal Code. He was charged that while operating a locomotive, due to his carelessness and negligence, wanton recklessness and unskillfulness, causing it to collide with a truck, two persons who were traveling on the truck were killed. The question which we now consider was not raised on appeal. The judgments appealed from were affirmed.

the same accident is much greater than the opposing tendency.[6]

As a general rule, the practice in Puerto Rico has been to prosecute, in every offense, as many times as there are victims of a single punishable act or omission.[7]

In *People* v. *Peña*, 73 P.R.R. 250 (1952), defendant-appellant was convicted by a jury on five counts for the offense of assault to commit murder. He was charged with firing three pistol shots at five policemen who were occupying a car, without injuring any of them. We held that "under these circumstances, the defendant could only be prosecuted for a single offense of assault to commit murder." We said in part as follows:

---

[6] The American jurisdictions which have considered the problem of how many offenses are committed by a person whenever, through the negligent operation of an automobile, he causes the death of several persons, so far as the time available has permitted us to investigate, present the following picture: In favor of as many offenses as there are victims: Arkansas, *Bolder* v. *Fraser*, 215 Ark. 67, 219 S.W.2d 625 (1949); California, *People* v. *Crow*, 48 C.A.2d 666, 120 P.2d 686 (1941); Florida, *State* v. *Lowe*, 130 So.2d 288 (D.C.A. 1961); Georgia, *Wellons* v. *State*, 77 Ga. 652, 48 S.E.2d 922 (1948); Illinois, *People* v. *Allen*, 368 Ill. 368, 14 N.E.2d 397 (1937); Kansas, *State* v. *Carte*, 157 Kan. 673, 143 P.2d 774 (1943); Kentucky, *Fleming* v. *Com.*, 284 Ky. 209, 144 S.W.2d 220 (1940); Massachusetts, *Com.* v. *Maguire*, 313 Mass. 669, 48 N.E.2d 665 (1943); Minnesota, *State* v. *Fredlund*, 200 Minn. 44, 273 N.W. 353 (1937); Missouri, *Burton* v. *State*, 226 Mo. 31, 79 So.2d 242 (1955); Nebraska, *Jeppaseu* v. *State*, 154 Neb. 765, 49 N.W.2d 611 (1951); Oklahoma, *Fay* v. *State*, 71 P.2d 768 (Cr.C.A. 1937); Ohio, *State* v. *Martin*, 154 Ohio 539, 96 N.E.2d 776 (1951); Virginia, *Lawrence* v. *Com.*, 181 Va. 582, 26 S.E.2d 54 (1943); Washington, *State* v. *Taylor*, 185 Wash. 198, 52 P.2d 1252 (1936).

See, also, 8 Blashfield, Cyclopedia of Automobile Law and Practice 529–30, § 5494; I Wharton, Criminal Law and Procedure 335 and 377; 14 Cal.Jur.2d 228, § 83; Anno.: *Acquittal or Conviction of One Offense in Connection with Operation of Automobile as Bar to Prosecution for Another*, 172 A.L.R. 1053, and other annotations appearing in 20 A.L.R. 341 (Supp.) and 113 A.L.R. 222.

In favor of a single offense: Iowa, *State* v. *Wheelock*, 216 Iowa 1428, 250 N.W. 617; New Jersey, *State* v. *Cosgrove*, 103 N.J.L. 412, 135 Atl. 871 (1927); Pennsylvania, *Com.* v. *McCord*, 116 Pa. 480, 176 Atl. 834 (1935); Tennessee, *Smith* v. *State*, 159 Tenn. 674, 21 S.W.2d 400 (1929).

[7] See *People* v. *Albizu*, 77 P.R.R. 851 (1955); and *People* v. *Palóu*, 80 P.R.R. 351 (1958).

". . . We gather that the scope and effect of the second assignment is to contend that he should have been accused of only one such offense and not of five.

"The question thus submitted has given rise, in cases of this nature, to an irreconcilable conflict of continental authority for, although some of the states of the Union hold that when there is a single act, attack or assault against several persons the defendant may be prosecuted as many times as there were persons affected by the act, attack or assault, nevertheless, there are others which have decided that the assailant may be prosecuted only for a single offense.

"A minute and thorough study of this problem convinces us that in cases of this type the question to be determined is whether or not defendant's act, attack or assault physically injured other persons and whether in order to prove this the evidence required in each case is the same or different. If defendant's assault did not physically injure the various persons involved and if the evidence required in each case is identical, the defendant can only be prosecuted for one offense. On the contrary, if as a result of the same assault, of the same act or of the same transaction several persons were injured, wounded or killed, then as many informations may be filed against the assailant as there were persons affected, provided that the evidence required in each case is different—regardless of the fact that the difference in the evidence be only a scintilla, say, for example, regarding the *corpus delicti*. 45 Harvard Law Review 535; 37 Id. 912; 20 Id. 642; 40 Yale Law Journal 462; 18 Cal. Law Review 171, 179; 14 Cal. Law Review 133; Dangel, Criminal Law, p. 373, § 199; Wharton's Criminal Law, Vol. 1, 12th Ed. pp. 531, 537, § 394; *Piquett* v. *United States,* 81 F.2d 75; *Commonwealth* v. *Roby,* 29 Mass. 496; *People* v. *Lagomarsino,* 217 P.2d 124; *State* v. *Corbett,* 109 S.E. 133; *People* v. *Majors,* 65 Cal. 138; *Spannell* v. *State,* 203 S.W. 357; 113 A.L.R. 215 and annotations on p. 222; 20 A.L.R. 341."

We see no valid reason for failing to apply the preceding criterion in the decision of cases in which several persons have been injured or killed as a result of a single motor vehicle accident, due to the negligence, carelessness, wanton recklessness, unskillfulness, lack of circumspection, or for

any other act or conduct of the driver which is not intentional, malicious or deceitful.

As we have stated, a great majority of the states of the Union which have dealt with this problem admit as many prosecutions as there are persons injured or killed. In 8 Cyclopedia of Automobile Law and Practice 529 and 530, Blashfield asserts:

"It has been said that where two or more individuals are injured in their persons, even though by *a single act*, there is a corresponding number of distinct offenses, since the consequences of the act affect each of the injured persons separately. Under this rule, therefore, where two or more persons are injured or killed in an automobile accident, the result of a prosecution involving the injury or death of one of such persons is no bar to a prosecution based on the injury or death of another of such persons." (Italics ours.)

Section 203 of our Penal Code defines the offense of manslaughter and its two kinds as follows:

"Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"1. Voluntary: upon a sudden quarrel or heat of passion.

"2. Involuntary: in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection."

The unlawful killing, without malice, of "a human being" as a result of a lawful act committed without due caution or circumspection constitutes an offense of involuntary manslaughter. Sections 205 and 206 clearly provide that "To make the killing . . . manslaughter, it is requisite that the party die" and "no person can be convicted of . . . manslaughter unless the death of the person," etc. They do not refer to "human beings" nor to "persons killed." An offense is therefore committed, with perfect independence and substantivity, each time a human being dies in these circumstances.

As a general rule, the will of the driver who causes death or serious bodily injury is not aimed at that result. A majority of traffic offenses occur against the driver's will. They are offenses of fault, within the strict meaning of the latter. The person is conscious of the failure to exercise due caution, knows that he is driving at excessive speed and against the elementary rules; he wants to do it; he realizes that by so doing he threatens the safety of circulation, the life of persons and his physical integrity; it is a psychic attitude of obstinacy or inconsiderateness, as stated by Professor Beristain, of the University of Deusto, in his interesting article *"Delincuencia del Tráfico y Delincuencia Juvenil,"* published in 218 *Revista General de Legislación y Jurisprudencia* 7–61 (1965).[8]

---

[8] In his comments on the causes of traffic accidents, Professor Beristain says that although, as to the fact, the cause as a general rule seems to be limited or confined to an omission to exercise due caution, if we succeed in psychoanalyzing the deep and unconscious aetiology of such conduct, we discover almost always a noticeable and reproachable flaw in the driver's personality, grouping those personalities as follows: The criminal personality, the most dangerous type; a majority are young people having antecedents of common offenses, such as vehicle thieves, fugitives from penitentiary institutions, and those sought by the police. The inadequate, savage personality; it has traits of unadaptation, without being an aggressive delinquent. "The asocial personality, due to immaturity or crisis. They have not as yet integrated in their life the social dimension of the traffic, or are suffering from an internal-environmental trauma. In psychologico-psychiatric terminology, they cannot be diagnosed as abnormal or psychopaths. Although in social life, away from the road, their conduct is unblemished, they commit real offenses on the road; on the road they are sick persons; in their appetitive-sentitive cosmovision, they lack the social and communitary facet of the traffic; they have conceptual knowledge of the regulations of the Code of Circulation, but not evaluative judgment; they operate the car as if it were a toy, as an individual amusement, not as a communitary chore. The force of the motor has awakened their personal internal weakness and has facilitated the manifestation of their immaturity or crisis; men who in the innermost of their psychism feel dissatisfaction, insecurity, and fear at times; men who, spurring the horses of their accelerator, are in search of compensation for their hidden complex of debility or inferiority; they love speed, they love dangerous overtakings, for the purpose of their own evasion, to satisfy their instinct of frustrated success in their private or enterprising life (47). This group

The clarity of the text of § 203 of our Penal Code leaves no room for interpreting it in the sense that, in a case of a single act of recklessness or lack of circumspection, the justiciable act is only one because the initial act was one only. We are dealing with a culpable offense against the person; the latter's protection is what prevails in its letter. The evidence of the corpus delicti in each case is different, since the passive subject in each violation of the section is distinct.

We are not called upon to declare the existence of implied impunity respecting the successive victims of the same culpable accident in the absence of a legal provision obviously permitting it. If the same is necessary or convenient

---

is the largest and is formed mostly by young people."

Professor Beristain further says:

"(III) We may therefore reach a conclusion which is highly tranquillizing and at the same time untranquillizing (48):

"(A) A majority of the road delinquents are normal people. In their external life their conduct is unblemished; they have never violated, nor will consciously violate, a section of the Penal Code, but

"(B) A majority of road delinquents are men whose self-conscience (exaggerated) of good gentleman and good driver grants them letters of marque to disregard and violate the traffic regulations; they know from experience that they will not be involved in an accident, and for that reason they believe that they can dispense with their obligations toward the general public.

"The primary cause of accidents is not the external perturbation of the car, of the pedestrian, or of the road, but the internal perturbation (reproachable) of the driver's psychism by his failure to take into consideration the traffic as a social task, in the shortage of the communitary values of the average man of our times. A man whose *I* has not been surpassed by the *ego*, nor by the *superego*, and, prompted by a desire for notoriety, is aggressive and threatens continuously (and unconsciously). A man for whom the other is not a companion (brother?) but a competitor whom it is necessary to overtake, no matter how, even eliminating him. The technical progress encourages this idea. Modern prosperity is not accompanied by a human and Christian sense of the limit (49). Safety and the personal (immanent-transcendent) satisfaction are lacking, and the psychological restlessness which this entails is translated into a desire for action which, owing to the absence of interpersonal sense, is evasive, aggressive and criminal action."

128

for the public interest, such action is for the state legislative assembly at the proper time.[9]

■ The filing of more than one information in these cases does not violate the prohibition of double jeopardy for the same offense. This case involves two separate and distinct offenses resulting from the same negligent act or

[9] Section 565 of the Penal Code of Spain punishes reckless negligence and simple recklessness or negligence. In its Judgment of April 2, 1932, the Supreme Court of Spain held that "if three offenses, one for damages and two for manslaughter, are committed as the result of a reckless act, since all of them are the result of a single culpable act, it would not be proper to punish them separately." In I-I *Derecho Penal* 325 (5th ed. 1959, Barcelona), Puig Peña cites that judgment without comments. However, Jiménez de Asúa, in his excellent *"Tratado de Derecho Penal,"* vol. V, pp. 1063–65 (2d ed. 1963, Editorial Losada, Buenos Aires), does not think that that criterion is correct and prefers that of the Argentine courts on the matter. The Master says:

"Without realizing what he says—and only in blind compliance with the decisions of the Supreme Court—Eugenio Cuello Colón has stamped this phrase: 'Although diverse damages may arise from a single reckless act, since the culpable act is only one, there is only a single offense of recklessness' (D.P., vol. I, p. 400). Cuello thus exalts, without realizing what he is doing, the formula of *crimen culpae* which we know the Spanish Code has not accepted unqualifiedly.

"The *case law of the Supreme Court of Spain* has consecrated the principle that when there is a plurality of evils or damages, they are charged as a single one, thereby following the dangerous path of *crimen culpae*, one and only. There are many judgments which declare that only one, and not several offenses, may be attributed to the reckless act producing several damages (Judgments of May 1, 1871; October 8, 1887; October 18 and December 12, 1927; December 14, 1931; April 2, 1932; May 11 and December 14, 1940, etc.). Some of these judgments contain very interesting pronouncements: If the reckless deed causes the death of a person and damages also, there is only one punishable deed, since there was only one act, even though they should be considered as two with regard to civil liability (Judgment of December 14, 1931). It is therefore error 'to punish separately each of the two deaths and damages caused, since the penalized party committed only one punishable violation by her failure to exercise due diligence and caution in the performance of the duty entrusted to her, thereby giving rise to the accidents, wherefore there is only one act . . . which must be punished' (Judgment of April 2, 1932), since the traditional technique of our Code 'leads to the conclusion that the distinct results of the culpable action should not be divided into as many other offenses as are committed through recklessness, but should be consolidated into a single imputation, which is recklessness and which, if

omission. That prohibition refers to the offense, not to its cause.[10]

The evidence on the information for the killing of the old lady was not sufficient to establish the facts charged for the killing of her granddaughter. It would have been necessary to establish at the trial by the former the additional fact of the unlawful killing of the granddaughter, and the indispensable circumstance that her death occurred "within a year and a day after the stroke received or the cause of death administered." Section 206 of our Penal Code provides:

"§ 638. Proof required

"No person can be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of the killing by the defendant as alleged, are established as independent acts; the former by direct proof and the latter beyond a reasonable doubt.—Penal Code, 1937, § 206."

We do not deny that a plurality of victims should produce, and as a general rule produces, greater impression in the mind of the jury as well as of any other person or group of normal persons. In every community, the more

---

there be malice, would constitute those several offenses' (Judgment of May 11, 1940).

"In turn, the *Argentine courts*, which are more in the right, and in view of the varied and exceptional typification of the culpable offenses, recognize the plurality of the latter and submit the case to the rule of concurrence. Thus, the Superior Court of Entre Ríos has declared that if one person is killed and others injured as a result of a single act imputable to the defendant by reason of his recklessness, such fact comes within the provisions of §§ 84 and 94 of the Penal Code, and that, pursuant to § 54 of the Code, there should be applied the sanction fixing the greater penalty (Judgment of May 23, 1944, in VI *Repertorio de la Ley* 422, No. 3)."

[10] The Fifth Amendment to the Federal Constitution provides in part that no person shall ". . . be subject *for the same offense* to be twice put in jeopardy." Section 11 of Art. II of our Constitution provides that "No person shall be twice put in jeopardy of punishment *for the same offense*." Section 6 of our Code of Criminal Procedure provides that "no person can be subjected to a second prosecution *for a public offense*."

exceptional the result of the culpable act or omission, the more intensive the emotional impact which it produces. But this subjective consideration may not be a factor to alter our opinion. The People is bound to present pertinent evidence to establish, beyond a reasonable doubt, the defendant's guilt, and the verdict to be brought must be based on such evidence. The defendant may, if he deems it convenient to his interest, have his case tried before a court without a jury, thereby waiving, as provided by law, his right to be tried by a jury. Under Rule 90 of the Rules of Criminal Procedure, defendant may request a separate trial in each case. Appellant moved and obtained several times the continuance of the trial, but never requested a separate trial. When the cases were called for joint trial on September 16, 1963, he did not make such a request either. One of his attorneys then said to the court: "Your Honor, the two cases will be heard here," and the court assented saying: "They are going to be heard jointly, if possible"—(Tr. Ev. 2)—and they were heard jointly after raising and deciding adversely the question that it was only proper to prosecute for a single offense.

█ The determination of the concurrent or consecutive service of the prison terms rests in the sound discretion of the trial court. In the light of the specific circumstances concurring in each case, and bearing in mind, naturally, as far as possible, the positive law involved and all the pertinent principles or factors of justice, such a determination should be made. We find no justification for altering the determination made in these cases. We believe it is consonant with those circumstances.

█ However, if defendant-appellant complies with the requisites or conditions established by Act No. 259 of 1946 (Sess. Laws, p. 534), as amended by Act No. 61 of 1965

(Sess. Laws, p. 120), he may move to suspend the effects of both sentences in order to remain free on parole.

The two judgments appealed from will be affirmed.